Your name: Theo Cedar Jones

Address: Mailing: 880 McElroy St Oakland

CA 94607

Phone Number: 510-789-6814

Fax Number:

E-mail Address: TheoCedarJones@gmail.com

Pro Se   [Select one: Plaintiff or Defendant]

RECEIVED

2022 JUL -7 P 2:20

CLERK, US DISTRICT COURT
NO. DIST. OF CA.

FILED

JUL -7 2022

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

[Select one location: San Francisco / Oakland / San Jose / Eureka]

Theo Cedar Jones )

vs.

Gavin Newsome et al )

Case Number: C22-03996

Ex Parte

*Emergency Pro Se Application for Temporary*
*Restraining Order and Preliminary Injunction*

DMR

I, Theo Cedar Jones bring this application for a temporary restraining order under Rule 65

of Federal Rules of Civil Procedure to enjoin DEFENDANTS (*briefly describe what you want*

*the court to do*) TO Stop them from destroying

MY HOME and community this Monday

with Bulldozers and Backhoes. see [EXHIBIT B]

TITLE OF DOCUMENT:_____   CASE NO.: _____

PAGE NO. ____ OF ____   [JDC TEMPLATE]

1

**Table of Authorities**

   1.  Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc

   2.  Winter v. Natural Res. Defense Council, Inc., 555 U.S. 7, 20 (2008)

   3.  Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134-35 (9th Cir. 2011)

   4.  Monterey Mech. Co. v. Wilson, 125 F.3d 702, 715 (9th Cir. 1997)

   5.  Nelson v. NASA, 530 F.3d 865, 882 (9th Cir. 2008)

   6.  Nat'l Aero. & Space Admin. v. Nelson, 56 U.S. 134 (2011)

   7.  Kennedy v. City of Ridgefield, 439 F.3d 1055, 1062 (9th Cir. 2006

   8.  Munger v. City of Glasgow, 227 F.3d 1082 (9th Cir. 2000)

   9.  White v. Rochford, 592 F.2d 381 (7th Cir. 1989)

   10. Sylvia Landfield Tr. v. City of L.A., 729 F.3d 1189, 1195 (9th Cir. 2013)

   11. Martin v. City of Boise, 902 F. 3d 1031, 1048 (9th Cir. 2018).

   12. LA Alliance For Human Rights vs County of LA 2:20-cv-02291-DOC-KES

**Related Cases**

   13. Sausalito/Marin County Chapter of the California Homeless Union et al vs City of Sausalito et al 21-cv-01143-EMC

   14. Marin County Homeless Union et al v. City of Novato et al (4:21-cv-05401)

   15. Naretto et al v. City of Petaluma et al (3:21-cv-10027)

**Procedural Background**

1.  The standards for a TRO are the same as those for a preliminary injunction. *See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 839 n.7 (9th Cir. 2001).* A plaintiff must demonstrate (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm that will result if an injunction is not issued, (3) the balance of equities tips in favor of the plaintiff, and (4) an injunction is in the public interest. *See Winter v. Natural Res. Defense Council, Inc., 555 U.S. 7, 20 (2008).* The Ninth Circuit has clarified that its "sliding scale" approach to preliminary injunctive relief

TITLE OF DOCUMENT:_____ CASE NO.: _____

PAGE NO. ____ OF ____ [JDC TEMPLATE]

1  is still viable. That is, if the plaintiff can demonstrate the risk of irreparable injury, under

2  the sliding scale test, the strength of the plaintiff's showing on the merits necessary to

3  secure a preliminary injunction varies with the degree to which the balance of hardship

4  tips in its favor. In other words, preliminary injunctive relief "'is appropriate when a

5  plaintiff demonstrates . . . that serious questions going to the merits were raised and the

6  balance of hardships tips sharply in the plaintiff's favor.'" *Alliance for the Wild Rockies v.*

7  *Cottrell, 632 F.3d 1127, 1134-35 (9th Cir. 2011).*

8

9  *2. LIKELIHOOD OF SUCCESS ON THE MERITS*

10  I am likely to succeed under Martin V Boise
    Because defendants Plan on destroying MY Home.

11  and community without offering Consrititionally

12  accessible housing. They have marked my home, an inopperable

13  van, for destruction on monday

14  *3. IRREPARABLE HARM:*

15  I am likely suffer irreparable harm or death

16  from the eviction. The eviction violates the

17  center for disease control guidance on covid 19
    and will expose me to irreparable insury and death to covid 19,

18  This will also destroy my only shelter and expose

19  to the elements. I will lose Hard sided shelter
    that Rrotccts me from private violence.

20  *4. BALANCE OF EQUITIES:*

21  This is life or death for me.

22  There is little impact on defendants,

23

24

25  *5. INJUNCTION IS IN THE PUBLIC INTEREST*

26  It is always in the Publics interest

27  to protect Peoples civil Rights

28

TITLE OF DOCUMENT:_____  CASE NO.: _____

PAGE NO. ____ OF ____  [JDC TEMPLATE]

1

2    6.  Moreover, the Ninth Circuit has held a violation of a person's constitutional rights may

3        also constitute irreparable injury see *Monterey Mech. Co. v. Wilson, 125 F.3d 702, 715*

4        *(9th Cir. 1997)* (noting that "'an alleged constitutional infringement will often alone

5        constitute irreparable harm'"); *Nelson v. NASA, 530 F.3d 865, 882 (9th Cir. 2008)*

6        (stating that, "[u]nlike monetary injuries, constitutional violations cannot be adequately

7        remedied through damages and therefore generally constitute irreparable harm"), rev'd

8        on other grounds, *Nat'l Aero. & Space Admin. v. Nelson, 56 U.S. 134 (2011)*.

9

10   7.  *CONSTITUTIONAL RIGHTS VIOLATED:*

11       1st, 4th, 5th, 8th, 14th

12

13

14

15

16

17              LIKLIHOOD TO SUCCEED ON ITS MERITS AND IRREPARABLE HARM

18                        STATE CREATED DANGER DOCTRINE

19

20   8.  The Ninth Circuit recognizes a substantive due process claim where there is a "state-

21       created danger" – i.e., where a state actor "'affirmatively place[s] an individual in danger'

22       by acting with 'deliberate indifference to [a] known or obvious danger in subjecting the

23       plaintiff to it.'" *Kennedy v. City of Ridgefield, 439 F.3d 1055, 1062 (9th Cir. 2006);* see

24       also id. at 1061 (noting that state action affirmatively places a plaintiff in a position of

25       danger "where state action creates or exposes an individual to a danger which he or she

26       would not have otherwise faced).

27   9.  But that is not the only situation where there is a state-created danger. In Kennedy itself,

28       the Ninth Circuit cited to cases where the state-created danger was, effectively, from the

TITLE OF DOCUMENT:_____  CASE NO.: _____

PAGE NO. ____ OF ____   [JDC TEMPLATE]

1    environment. See id. at 1061 n.1 (citing *White v. Rochford, 592 F.2d 381 (7th Cir. 1989)*,

2    where "defendants left helpless minor children subject to inclement weather and great

3    physical danger without any apparent justification'"); id. at 1062 (citing *Munger v. City*

4    *of Glasgow, 227 F.3d 1082 (9th Cir. 2000)*, which held that "police officers could be held

5    liable for the hypothermia death of a visibly drunk patron after ejecting him from a bar on

6    a bitterly cold night").  In this case during COVID-19 Pandemic, the cities threats of

7    evicting me from my campsite also significantly increase my risk of being irreparably

8    harmed or killed by COVID-19 by making it impossible for me to comply with COVID -

9    19 guidelines to shelter in place.

10

11    *10. HOW THE DEFENDANTS ACTIONS ARE AFFIRMATELY PLACING ME IN DANGER:*

Defendants are destroying my only
Shelter in the midst of a covid 19
Surge

Defendants are destroying my community
that Protects me from private violence.

Defendants will expose to the elements
and destroy all my property

TITLE OF DOCUMENT:_____ CASE NO.: _____

PAGE NO. ____ OF ____   [JDC TEMPLATE]

11. Furthermore, the balance of hardships tip so far in my favor that it appears to be totally arbitrary. *Sylvia Landfield Tr. v. City of L.A.*, 729 F.3d 1189, 1195 (9th Cir. 2013) (stating that "'[s]ubstantive due process protects individuals from arbitrary deprivation of their liberty by government'[;] [t]o constitute a violation of substantive due process, the alleged deprivation must 'shock the conscience and offend the community's sense of fair play and decency'").

12. *HOW DEFENDANTS ACTIONS SHOCK CONSCIENCE AND OFFEND THE COMMUNITY'S SENSE OF FAIR PLAY AND DECENCY*

They could kill me. They are going to destroy my community.

13. Furthermore, the ninth circuit recognizes state-created danger that arises from "private violence." Id. For example, in *Kennedy v. City of Ridgefield*, the plaintiff filed suit against a city and a police officer after her neighbor's son – whom she had told the police had molested her child – shot her and shot and killed her husband. See id. at 1058 (noting that, according to the plaintiff, the officer promised to give notice "prior to any police contact with the Burns family about her allegations" but failed to give advance notice; also, after belatedly telling the plaintiff about his contact with the neighbor, the officer

TITLE OF DOCUMENT:_____    CASE NO.: _____

PAGE NO. ____ OF ____    [JDC TEMPLATE]

1    gave the assurance that the policy would patrol the area around her house and the

2    neighbor's house).

3

4

5

6

7    14. (describe how defendants actions are putting you in danger of violence by law

8    enforcement officers or by private citizens.

9        I need my community to
10    Protect Me from private violence.

11

12

13

14

15

16

17

18

19

20                      **Balance of Hardships and Public Interest**

21    15. The balance of hardships tips strongly in my favor, since I am currently suffering

22    irreparable harm by DEFENDANTS willful and wanton disregard for my welfare.

23

24

25

26

27

28

TITLE OF DOCUMENT:_____ CASE NO.: _____

PAGE NO. ____ OF ____    [JDC TEMPLATE]

1

2

<u>VERIFICATION</u>

3    I, <u>Theo Cedar Jones</u> the plaintiff in the above case submit attached application for temporary

4    restraining and preliminary injunction order to the court so that can justice can be done in this

5    matter. I also attach the foregoing Index of Exhibits.

6

7

8

9

10

11

12

13    Date: __7/7/22__          Sign Name: ___Theo Cedar Jones___

14                              Print Name: ___Theo Cedar Jones___

15

16

17                          INDEX OF EXHIBITS

18

| 19 | A | CENTER FOR DISEASE CONTROL GUIDANCE COVID 19 HOMELESSNESS |
| 20 | B | Notice ON MY HOME FoR ITS Destruction |
| 21 | | |
| 22 | | |
| 23 | | |

24

25

26

27

28

TITLE OF DOCUMENT:_____ CASE NO.: _____

PAGE NO. ___ OF ___   [JDC TEMPLATE]

EXHIBIT A

 Centers for Disease
Control and Prevention



# Interim Guidance on People Experiencing Unsheltered Homelessness

Interim Guidance

Updated Feb. 10, 2022

CDC is in the process of reviewing these recommendations to determine how to align current precautions with the CDC's new COVID-19 Community Levels recommendations. Updates will be posted here when available.

This interim guidance is based on what is currently known about coronavirus disease 2019 (COVID-19). The Centers for Disease Control and Prevention (CDC) will update this interim guidance as needed and as additional information becomes available.

# Summary of Recent Changes

Updates as of February 10, 2022 ⌃

- Updated quarantine and isolation guidance for people experiencing unsheltered homelessness.

- Incorporating recommendations for persons who are up to date on COVID-19 vaccinations.

View previous updates

People experiencing unsheltered homelessness (those sleeping outside or in places not meant for human habitation) may be at risk for infection when there is community spread of COVID-19. This interim guidance is intended to support response to COVID-19 by local and state health departments, homelessness service systems, housing authorities, emergency planners, healthcare facilities, and homeless outreach services. Homeless shelters and other facilities should also refer to the Interim Guidance for Homeless Shelters.

COVID-19 is caused by a coronavirus. Vaccination is the leading prevention measure to keep clients, outreach staff, and volunteers from getting sick with COVID-19. COVID-19 vaccines are safe and effective and are available at no cost to everyone ages 5 years and older living in the United States, regardless of insurance or immigration status. Learn more about the Benefits of Getting a COVID-19 Vaccine. See Interim Guidance for Health Departments: COVID-19 Vaccination Implementation for People Experiencing Homelessness for more information.

Lack of housing contributes to poor physical and mental health outcomes, and linkages to permanent housing for people experiencing homelessness should continue to be a priority, while addressing risks associated with the COVID-19 pandemic. In the context of COVID-19 spread and transmission, the risks associated with sleeping outdoors or in an encampment setting are different than from staying indoors in a congregate setting such as an emergency shelter or other congregate living facility. Outdoor settings may allow people to increase physical distance between themselves and others. However, sleeping

outdoors often does not provide protection from the environment, adequate access to hygiene and sanitation facilities, or connection to services and healthcare. The balance of risks should be considered for each individual experiencing unsheltered homelessness.

# Community coalition–based COVID–19 prevention and response

Planning and response to COVID-19 transmission among people experiencing homelessness requires a "whole community" ☑ approach, which means involving partners in the response plan development, with clearly outlined roles and responsibilities. Table 1 outlines some of the activities and key partners to consider for a whole-community approach.

Table 1: Using a whole-community approach to prepare for COVID-19 among people experiencing homelessness

**Connect to community-wide planning**

Connect with key partners to make sure that you can all easily communicate with each other while preparing for and responding to cases. A community coalition focused on COVID-19 planning and response should include:
- Local and state health departments
- Outreach teams and street medicine providers
- Homeless service providers and Continuum of Care leadership
- Emergency management
- Law enforcement
- Healthcare providers
- Housing authorities
- Local government leadership
- Other support services like case management, emergency food programs, syringe service programs, and behavioral health support
- People with lived experiences of homelessness

People with lived experiences of homelessness can help with planning and response. These individuals can serve as peer navigators to strengthen outreach and engagement efforts. Develop an advisory board with representation from people with current or former experiences of homelessness to ensure community plans are effective.

**Identify additional sites and resources**

Continuing homeless services during community spread of COVID-19 is critical. Make plans to maintain services for all people experiencing unsheltered homelessness. Furthermore, clients who are positive for COVID-19 or exposed to someone with COVID-19 need to have access to services and a safe place to stay, separated from others who are not infected. To facilitate the continuation of services, community coalitions should identify resources to support people sleeping outside as well as additional temporary housing, including sites with individual rooms that are able to provide appropriate services, supplies, and staffing. Temporary housing sites should include:
- Overflow sites to accommodate shelter decompression and higher shelter demands
- Isolation sites for people who are confirmed to be positive for COVID-19 by laboratory testing
- Quarantine sites for people who are awaiting testing, awaiting test results, or who were exposed to COVID-19
- Protective housing for people who are at increased risk for severe illness from COVID-19

Depending on resources and staff availability, housing options that have individual rooms (such as hotels/motels) and separate bathrooms should be considered for the overflow, quarantine, and protective housing sites. In addition, plan for how to connect clients to housing opportunities after they have completed their stay in these temporary sites.

# Communication

Outreach workers and other community partners, such as emergency food provision programs or law enforcement, can help ensure people sleeping outside have access to updated information about COVID-19 and access to services.

- Stay updated on the local level of transmission of COVID-19.
- Build on existing partnerships with peer navigators who can help communicate with others.
- Maintain up-to-date contact information and areas frequented for each client.
- Communicate clearly with people sleeping outside.
    - Use health messages and materials developed by credible public health sources, such as your local and state public health departments or the Centers for Disease Control and Prevention (CDC).
    - Post signs in strategic places (e.g., near handwashing facilities) providing information on vaccination, physical distancing, handwashing, and cough etiquette 🔗 [322 KB, 1 Page].
    - Provide educational materials about COVID-19 for everyone, including people with limited English proficiency, people with intellectual or developmental disabilities, and people with hearing or vision impairments.
    - Ensure communication with clients about changes in homeless services policies and/or changes in physical location of services such as food, water, hygiene facilities, regular health care, and behavioral health resources.
- Identify and address potential language, cultural, and disability barriers associated with communicating COVID-19 information to workers, volunteers, and those you serve. Learn more about reaching people of diverse languages and cultures.

## Considerations for outreach staff and volunteers

*Staff and volunteer training and policies*

- Provide training 🔗 [1.19 MB, 50 Pages] and educational materials related to COVID-19 for staff and volunteers.
- When possible, minimize face-to-face interactions with clients for staff members who are not up to date on COVID-19 vaccination.
- Develop and use contingency plans for increased absenteeism caused by employee illness or by illness in employees' family members. These plans might include extending hours, cross-training current employees, or hiring temporary employees.
- Prepare to support case investigation and contact tracing activities in collaboration with local health departments.
- Regardless of vaccination status, assign outreach staff and volunteers who are at increased risk for severe illness from COVID-19 to duties that do not require them to interact with clients in person.
- Outreach staff and volunteers should review stress and coping resources for themselves and their clients during this time.

*Staff and volunteer prevention measures*

- Encourage staff and volunteers to get vaccinated and boosted as soon as possible and stay up to date on vaccinations.
- Advise staff who are not up to date on COVID-19 vaccination to maintain 6 feet of distance while interacting with clients, staff, and volunteers, where possible.
- Require outreach staff to wear well-fitting masks or respirators when working in public settings or interacting with clients. They should still maintain a distance of 6 feet from each other and clients, even while wearing masks.
- Encourage outreach staff, regardless of vaccination status, to maintain good hand hygiene by washing hands with soap and water for at least 20 seconds or using hand sanitizer (with at least 60% alcohol) on a regular basis, including before and after each client interaction.
- Advise outreach staff, regardless of vaccination status, to avoid handling client belongings. If staff are handling client belongings, they should use disposable gloves, if available. Make sure to train any staff using gloves to ensure proper use and ensure they perform hand hygiene before and after use. If gloves are unavailable, staff should perform hand hygiene immediately after handling client belongings.
- Outreach staff who are checking client temperatures should use a system that creates a physical barrier between the client and the screener.
    - Where possible, screeners should remain behind a physical barrier, such as a glass or plastic window or partition (e.g., a car window) that can protect the staff member's face from respiratory droplets that may be produced if the

produced if the client sneezes, coughs, or talks.

- – If physical distancing or barrier/partition controls cannot be put in place during screening, personal protective equipment (PPE, e.g., facemask, eye protection [goggles or disposable face shield that fully covers the front and sides of the face], and a single pair of disposable gloves)  can be used when within 6 feet of a client.

- For street medicine or other healthcare professionals, regardless of vaccination status, who are caring for clients with suspected or confirmed COVID-19 should follow Infection Prevention and Control Recommendations for Healthcare Personnel During the COVID-19 Pandemic.

- Outreach staff, regardless of vaccination status, who do not interact closely (e.g., within 6 feet) with sick clients and do not clean client environments do not need to wear PPE.

- Outreach staff, regardless of vaccination status, should launder work uniforms or clothes after use using the warmest appropriate water setting for the items and dry items completely.

- As long as they don't provide services within congregate homeless service sites, outreach staff may follow general population guidance to end isolation or quarantine.

*Staff process for outreach*

- In the process of conducting outreach, staff should
  - – Greet clients from a distance of 6 feet and explain that you are taking additional precautions to protect yourself and the client from COVID-19..
  - – Wear a well-fitting mask or respirator.
  - – Provide the client with a well-fitting mask or respirator.
  - – Screen clients for symptoms by asking them if they feel as if they have a fever, cough, or other symptoms consistent with COVID-19.
    - Children have similar symptoms to adults and generally have mild illness.
    - Older adults and people with underlying medical conditions may have delayed presentation of fever and respiratory symptoms.
    - If medical attention is necessary, use standard outreach protocols to facilitate access to healthcare.
  - – Continue conversations and provision of information while maintaining 6 feet of distance.
  - – If at any point you do not feel that you are able to protect yourself or your client from the spread of COVID-19, discontinue the interaction and notify your supervisor.

# Considerations for assisting people experiencing unsheltered homelessness

*Help clients reduce their risk of becoming ill from COVID-19*

- Strongly recommend clients receive a COVID-19 vaccine and booster. Be prepared to address common questions about COVID-19 vaccination and provide information about how to access vaccination.

- Those who are experiencing unsheltered homelessness face several risks to their health and safety. Consider the balance of these risks when addressing options for decreasing COVID-19 spread.

- Continue linkage to homeless services, housing, medical, mental health, syringe services, and substance use treatment, including provision of medications for opioid use disorder (e.g., buprenorphine, methadone maintenance, etc.). Use telemedicine, when possible.

- Some people who are experiencing unsheltered homelessness may be at increased risk of severe illness from COVID-19 due to older age or certain underlying medical conditions, such as chronic lung disease or serious heart conditions.
  - – Reach out to these clients regularly to ensure they are linked to care as necessary.
  - – Prioritize providing individual rooms for these clients, where available.

- Recommend that all clients wear well-fitting masks or respirators any time they are around other people. Masks should not be placed on children under age 2, anyone who has trouble breathing, or is unconscious, incapacitated, or otherwise unable to remove the mask without assistance.

- Provide clients with hygiene materials, where available.

- Discourage clients who are not up to date on COVID-19 vaccination (or have unknown vaccination status) from spending time in crowded places or gathering in large groups, including locations where food, water, or hygiene supplies are being distributed.

- Clients who come into close contact with someone with COVID-19 should quarantine away from crowded or congregate settings for 10 days as much as possible and be tested at least 5 days after their last known close contact, regardless of their vaccination and booster status, unless directed otherwise by state or local health officials.

- Clients may follow general population guidance for the end of quarantine in other community settings. For example, if a client is working in a setting that is not a at higher risk for transmission, they may return to work in accordance with the general population guidance.

- During crisis situations (i.e., space or staff shortages that threaten the continuity of essential operations), homeless service providers should consult their state, local, territorial, or tribal health department to consider options for shortening the duration of quarantine or isolation for clients. Reducing quarantine or isolation duration may be recommended for groups at lower risk of infection first (e.g., those who are up to date on their COVID-19 vaccines).

*Help link sick clients to medical care*

- Regularly assess clients for symptoms.
    - Provide anyone who presents with symptoms with a mask.
    - Clients who have symptoms may or may not have COVID-19. Make sure they have a place they can safely isolate in coordination with local health authorities.
    - If available, a nurse or other clinical staff can help with clinical assessments. These clinical staff should follow personal protective measures.
    - Facilitate access to non-urgent medical care as needed.
    - Use standard outreach procedures to determine whether a client needs immediate medical attention. Emergency signs include **but are not limited to**:
        - Trouble breathing
        - Persistent pain or pressure in the chest
        - New confusion or inability to arouse
        - Pale, gray, or blue-colored skin, lips, or nail beds, depending on skin tone
    - Please refer clients for medical care for any other symptoms that are severe or concerning to you.
    - Notify the designated medical facility and transporting personnel that clients might have COVID-19.
- If a client has tested positive for COVID-19
    - Use standard outreach procedures to determine whether a client needs immediate medical attention.
    - If immediate medical attention is not required, facilitate transportation to an isolation site.
    - Notify the designated medical facility and transporting personnel that clients might have COVID-19.
    - If medical care is not necessary, and if no other isolation options are available, advise the individual on how to isolate themselves while efforts are underway to provide additional support.
    - Coordinate with the local health department and provide locating information for case investigation and contact tracing.
    - All clients who have symptoms of COVID-19 or receive a positive test result for COVID-19, regardless of their vaccination and booster status or symptoms, should isolate away from crowded areas or congregate settings for 10 days as much as possible from the date symptoms began or the date of the positive test if they do not have symptoms, unless directed otherwise by state or local health officials.
    - Clients may follow general population guidance for the end of isolation in other community settings. For example, if a client is working in a setting that is not at high risk for transmission, they may return to work in accordance with the general population guidance.
    - During isolation, ensure continuation of behavioral health support for people with substance use or mental health disorders.
    - In some situations, for example due to severe untreated mental illness, an individual may not be able to comply with isolation recommendations. In these cases, community leaders should consult local health authorities to determine alternative options.

- Ensure the client has a safe location to recuperate (e.g., respite care) after isolation requirements are completed, and follow-up to ensure medium- and long-term medical needs are met.

# Considerations for encampments

- If individual housing options are not available, allow people who are living unsheltered or in encampments to remain where they are.
  - Clearing encampments can cause people to disperse throughout the community and break connections with service providers. This increases the potential for infectious disease spread.
- Encourage people staying in encampments to set up their tents/sleeping quarters with at least 12 feet x 12 feet of space per individual.
  - If an encampment is not able to provide sufficient space for each person, allow people to remain where they are but help decompress the encampment by linking those at increased risk for severe illness to individual rooms or safe shelter.
- Work together with other community organizations and offices to improve sanitation in encampments.
- Ensure nearby restroom facilities have functional water taps, are stocked with hand hygiene materials (soap, drying materials) and bath tissue, and remain open to people experiencing homelessness 24 hours per day.
- If toilets or handwashing facilities are not available nearby, assist with providing access to portable latrines with handwashing facilities for encampments of more than 10 people. These facilities should be equipped with hand sanitizer (containing at least 60% alcohol).

# Considerations for a Long-Term Infection Prevention Strategy for People Experiencing Unsheltered Homelessness

When community COVID-19 transmission levels change, some communities might consider when to modify the COVID-19 prevention measures described above. Below are several factors to consider before modifying community-level COVID-19 prevention approaches for people experiencing unsheltered homelessness, for example, changing outreach team procedures or approaches to COVID-19 prevention in encampments. These factors should be considered together; no single factor should be used alone to decide changes in approach.

These factors should be discussed with local public health partners, community homeless service providers, and people with lived experience of homelessness. Any modifications to COVID-19 prevention measures should be conducted in a phased and flexible approach, with careful monitoring of COVID-19 cases in the community. Connecting people experiencing homelessness to permanent stable housing should continue to be the primary goal.

**Community Transmission Levels**: *What is the incidence of COVID-19 in the community?*

The incidence of COVID-19 in the community will influence the risk of infection for people experiencing unsheltered homelessness. The CDC COVID Data Tracker has a tool that displays the current level of community transmission at the county level. Increasing COVID-19 vaccination coverage in the surrounding community is important to help reduce community transmission, but community vaccination coverage should not be used alone to decide to modify approaches to prevention among people experiencing unsheltered homelessness.

**Vaccination Levels:** *What proportion of people experiencing unsheltered homelessness in the community are up to date with COVID-19 vaccination?*

Vaccination significantly decreases the likelihood of severe disease from the virus that causes COVID-19. People experiencing unsheltered homelessness who are up to date on COVID-19 vaccination do not need to wear masks unless they are accessing services in a homeless service facility or in public indoor settings in areas of substantial or high transmission. Although we know vaccines help protect individuals, there is not enough information available yet to determine a level of vaccination coverage needed to modify community-level COVID-19 prevention measures. Note: Vaccination status should not be a barrier to accessing homeless services. COVID-19 vaccinations should not be mandatory to receive homeless services unless required by state or local health authorities.

**Availability of Housing:** *What is the housing availability in the community?*

Any modifications to approaches to encampments or people experiencing unsheltered homelessness should be conducted with an awareness of housing availability and homeless service capacity. Closing encampments can lead people to disperse and result in increased crowding at other encampments or in shelters, which can increase the risk of spreading infectious disease, including COVID-19. Encampment disbursement should only be conducted as part of a plan to rehouse people living in encampments, developed in coordination with local homeless service providers and public health partners.

Even if the community decides to modify some infection prevention measures for people experiencing unsheltered homelessness, continue to maintain the following key components of a sustainable approach to disease prevention and response.

1. Monitor community transmission of COVID-19 in the area. For the latest updates on county-level transmission of the virus that causes COVID-19, use this CDC COVID Data Tracker tool.
2. Create flexible quarantine and isolation locations that are scalable, in case the number of COVID-19 cases in the community increases.
3. Keep a minimum set of public health prevention and control procedures in place at all times, including
    a. Working together with community organizations to improve sanitation in encampments.
    b. Ensuring access to handwashing facilities and supplies.
    c. Providing place-based, regular health evaluations and linkages to medical care, including access to COVID-19 vaccination, routine vaccinations, and behavioral health services.

## More Information

Considerations for food pantries and food distribution sites

Information for health departments

Guidance for homeless service providers

COVID-19 fact sheets for people experiencing homelessness (at the bottom of the page)

Department of Housing and Urban Development (HUD) COVID-19 resources ⬀

CDC's COVID-19 stress and coping information

What We Can Do To Promote Health Equity

Toolkit for People Experiencing Homelessness

# Previous Updates

## Updates from Previous Content                                                    ⌃

As of November 4, 2021

• Updated guidance to reflect authorization of COVID-19 vaccines for children ages 5–11.

As of July 7, 2021

• Added information on vaccination for people experiencing unsheltered homelessness
• Updated considerations based on vaccination status

As of June 7, 2021

- Added considerations for developing a long term strategy related to COVID-19 prevention among people experiencing unsheltered homelessness

As of May 10, 2020

- Revisions to document organization for clarity
- Description of "whole community" approach
- Clarification of outreach staff guidance
- Clarification of encampment guidance

Last Updated Feb. 10, 2022

EXHIBIT B

